UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

WINSTON BUSH,

                      Plaintiff,           Case No.: 12-11790
                                                Honorable Arthur J. Tarnow
                v.                    Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                      Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 11]

    Plaintiff Winston Bush brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act").  Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

    For the reasons set forth below, the court finds that the ALJ did not err in concluding that Bush could perform his past relevant customer service work and that substantial evidence supports the ALJ's decision.  Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [11] be GRANTED, Bush's motion [8] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On December 31, 2008, Bush filed applications for DIB and SSI, alleging disability as of June 4, 2008. (Tr. 130-39). The claims were denied initially on May 5, 2009. (Tr. 76-79, 80-87). Thereafter, Bush filed a timely request for an administrative hearing, which was held on January 21, 2011, before ALJ James Prothro, II. (Tr. 27-75). Bush, represented by attorney Mikel Lupisella, testified, as did vocational expert Richard Riedl. (*Id.*). On February 14, 2011, the ALJ found Bush not disabled. (Tr. 11-25). On March 28, 2012, the Appeals Council denied review. (Tr. 1-4). Bush filed for judicial review of the final decision on April 20, 2012 [1].

B.    **Background**

1.    *Disability Reports*

In a disability report filed on December 31, 2008, Bush reported that the conditions preventing him from working were chest pain/inflammation in the cartilage, thoracic strain, left arm, back, rib and neck pain. (Tr. 168). He reported that his pain stemmed from a workplace accident where he injured his chest wall lifting a keg of beer as a warehouseman for a beer distributor. (*Id.*). He reported constant pain "which increases if lifting anything over 25lbs or standing or walking over a period of time." (*Id.*). He reported "some relief" from pain medication but that the medication made him "tired and forgetful." (*Id.*). He also reported having asthma, which causes him to "cough and wheeze while lifting," increasing his chest pain. (*Id.*). He reported that he attempted to continue to work, with restrictions, after his initial accident, but that his condition continued to worsen. (Tr. 169).

Bush reported that besides beer delivery, he had previously held jobs as a customer service representative, furniture deliverer, cook, cleaner, machine operator, painter,

merchandiser, stocker, truck loader and welder.  (Tr. 169-70).  He reported seeing several doctors for his conditions and undergoing a few tests.  (Tr. 172-75).  He also reported being on medications for acid reflux, asthma, allergies, muscle spasms, inflammation, high blood pressure and pain.  (Tr. 174-75).  In a work history report from the same date, Bush concluded by saying "there are no other positions available for me to perform at my current employer that do not involve lifting and carrying."  (Tr. 197).

In a January 26, 2009 function report, Bush reported that his days consist of going to doctor appointments, doing home exercises, taking medications, dealing with pain and the side effects of his medications, and visiting with family.  (Tr. 199).  He reported that his conditions affect his ability to sleep, as he feels sick and uncomfortable and has pain and sleeplessness.  (Tr. 200).  He reported no problems with his personal care.  (*Id.*).  He reported making meals daily that took from 15 minutes to an hour, but that he was unable to perform household chores.  (Tr. 201).  He reported going outside daily and being able to walk, drive and ride in a car, as well as use public transportation.  (Tr. 202).  He can go out alone and he shops daily for food or clothes, usually taking 1-3 hours.  (*Id.*).  He also visits daily with others and his hobbies include reading, bird watching, movies, and watching sports on television.  (Tr. 203).

Bush reported that his conditions and pain affect his ability to lift, squat, bend, reach, stand, walk, sit, kneel, and climb stairs.  (Tr. 204).  He reported that the side effects of his medication affect his memory, concentration and ability to complete tasks.  (*Id.*).  He reported that he can only lift up to 25 pounds occasionally, can walk 20-50 feet before needing to rest, can pay attention for 15 minutes at a time and can follow instructions "to the best of my ability." (*Id.*).  He reported getting along "fine" with authority figures.  (Tr. 205).

In a May 30, 2009 disability appeals report, Bush reported that his conditions had

worsened in that his asthma was not controlled and that he continued to have back and neck pain, although he noted that these changes occurred in 2007, well before he filed his initial disability report.  (Tr. 223).  He reported no new illnesses or limitations since his original report.  (*Id.*).

In a December 23, 2009 Asthma Questionnaire, Bush reported that "anything exercised induced" brings on asthma attacks that last 10-20 minutes or until his medication begins working.  (Tr. 228).  He reported having weekly allergy shots, and taking a number of different medications and inhalers for his asthma.  (*Id.*).  He reported having several chest x-rays and breathing tests and that he also had wheezing and breathing trouble between attacks.  (Tr. 229).

### 2. *Plaintiff's Testimony*

At the hearing, Bush testified that he strained his chest wall stacking kegs while working for a beer distributor.  (Tr. 43).  He did not have surgery for his injury, but did receive a hard back and chest brace, which he tried to wear all the time, but which caused him pain where it pushed against his ribs.  (Tr. 44-46).  He was told to discontinue the brace.  (Tr. 46).  He testified that he went back to work after his injury, which occurred in March 2007, after attending physical therapy.  (Tr. 46-47).  He was under restrictions upon his return which allowed him to do all of his normal tasks except lift kegs.  (Tr. 47).  He was told he would never be able to return to heavy work.  (Tr. 50).  However, even lifting the lighter objects, which were still quite, heavy caused him to reinjure himself and he was eventually terminated in June 2008 because he could no longer physically perform his job.  (Tr. 47-48).  Bush testified that since that time he attempted to return to work at a car part manufacturer.  (Tr. 49).  However, he reinjured himself at that job lifting bumper clamps.  (*Id.*).  His doctor had not released him to work since that time. (Tr. 50).  However, he stopped seeing that doctor after he lost his job because he no longer had medical insurance.  (Tr. 53).  He testified that he is seeing another physician through a referral

from an emergency room visit, and that that physician issued work limitations.  (Tr. 54).  Bush also expected to receive a functional assessment at a rehabilitation center in "the next week or two," though it is unclear whether he did so.  (Tr. 54-55).  He testified that his condition would be aggravated by lifting and even by driving a car due to the need to keep his arms up, which is uncomfortable and painful.  (Tr. 50-51).  He testified that he was taking 20 milligrams of Methadone four times a day and 200 milligrams of Neurontin three times a day for his pain.  (Tr. 62).  Bush also testified that he suffered from asthma, for which he was taking medication.  (Tr. 51).  He further testified that he had been issued a medical marijuana certificate by a Dr. Parker in Southfield, who requested Bush's files from his former doctor "went over it and [ ] said I was approved, and they gave me that piece of paper."  (Tr. 55).  However, he had not yet received a card.  (*Id.*).

Bush testified that his pain impacted his ability to sleep but that he was capable of caring for his personal needs, cooking meals, and helping with laundry and shopping.  (Tr. 56-57).  He also testified that he still engages in his hobbies of bird watching, movies, and watching sports on television.  (Tr. 57).  He testified that he can lift 25 pounds and walk 20-50 feet before needing to rest 15 minutes.  (Tr. 57-58).  He also testified that the side effects of his medication affect his ability to remember, complete tasks and concentrate in that they make him dizzy and drowsy, and his pain makes it difficult for him to pay attention longer than about 15 minutes.  (Tr. 58).  He naps approximately twice a day for "[a]n hour or two."  (Tr. 58-59).  He also testified that his doctor had given him permission to apply for a crossbow for hunting season.  (Tr. 59).  However he had not been hunting since June 2008 due to the pain.  (*Id.*).

3.    *Medical Evidence*

a.    *Treating Sources*

i.    Emergency Room Records

On April 3, 2007, Bush was treated in the emergency room for a diagnosed chest wall strain that he reported arose from heavy lifting at work the day before.  (Tr. 245; 253).  He reported that his pain level was 10/10 in his chest wall and upper back.  (Tr. 249).  He reported that he woke up with this pain in his back that radiated to his chest.  (*Id.*).  Upon exam, Bush had a full range of motion, and his pain was reproducible with touch.  (*Id.*).  His range of motion was normal.  (*Id.*).  An x-ray was "negative for any acute process."  (Tr. 253; 255).  He was given a Toradol injection and prescribed Tylenol #3 and Motrin.  (Tr. 247; 251).

Bush was treated in the emergency room again for chest pain on November 28, 2010.  (Tr. 447-48).  He reported aggravating a previous injury while at work resulting in right-sided chest pain that was worse when he moved, stretched or laid down.  (Tr. 447).  He reported that he had previously been on Norco and methadone and that ibuprofen did not work for him, although he had not tried any that day.  (*Id.*).  Upon examination Bush was tender along the costochondral junctions, mostly ribs 3-5.  (*Id.*).  There was also a little discomfort in the right scapular area.  (*Id.*).  Bush was diagnosed with acute chest wall pain or chest wall strain.  (Tr. 448).  He reported not having a primary care physician at the time and was given numbers for doctors.  (Tr. 447).  He was also informed that the emergency room did not prescribe methadone.  (Tr. 448).  He was given a prescription for Norco "for pain not relieved with NSAIDs first," and was encouraged to follow-up with occupational medicine.  (*Id.*).  He was given an off-work slip for two days until he could follow up.  (*Id.*).

6

ii.     Dr. Saleh Dyke

Bush was treated by Dr. Saleh Dyke, a primary care physician, on June 1, 2007, complaining of a back and chest wall strain resulting from a work-related injury in April 2007. (Tr. 328). According to the notes, Dr. Dyke had previously treated him for this injury, but there are no earlier notes from Dr. Dyke in the record. (*Id.*). Bush was being treated with non-steroidal anti-inflammatories, narcotic analgesics and muscle relaxants and reported "doing better," but "not yet ready to go back to his physical job." (*Id.*). He complained of pain in his chest wall with lifting, twisting and raising his upper extremities overhead. (*Id.*). Upon examination, he had a normal range of motion in his extremities, and was intact neurologically. (*Id.*). Dr. Dyke assessed Bush with work-related chest wall strain and recommended a back-to-work date without restrictions of June 25, 2007. (*Id.*; 327).

On December 4, 2007, Bush was treated for an acute upper respiratory infection and Dr. Dyke recommended a recheck in 5-7 days. (Tr. 317). At a follow-up on January 7, 2008, Bush reported pain in his lower back, hips and down his legs with no known injury, that increased with sitting down. (Tr. 314). He also reported vomiting and having abdominal discomfort. (*Id.*). While some of the notes are illegible, it appears Dr. Dyke assessed Bush with an acute gastrointestinal issue. (*Id.*). He also assessed Bush with acute lumbar strain. (*Id.*). Bush was rechecked on January 30, 2008. (Tr. 310). His gastrointestinal discomfort was better but still present, and he reported stable asthma and allergy symptoms. (*Id.*). He did not report issues with his lumbar spine. (*Id.*). He requested a work excuse for January 24 and 25, 2008. (*Id.*). Dr. Dyke assessed him with probable irritable bowel syndrome. (*Id.*).

On February 21, 2008, Bush was treated for another acute upper respiratory infection and given a course of prednisone. (Tr. 308). He had no wheezes, rubs, rhonchi or rales. (*Id.*). He

also complained of increased lower back pain and requested Vicodin, although it is not clear whether he was given a prescription, and Dr. Dyke made no assessment with regard to Bush's back. (*Id.*). At an appointment on March 26, 2008, Bush sought an FMLA form signature to assist his father who had just had a liver transplant. (Tr. 306). He sought the same at an appointment on April 22, 2008. (Tr. 305). At that appointment, Bush also reported increased wheezing and coughing for the past two weeks, needing a refill on his medications and a prednisone burst. (*Id.*). Dr. Dyke refilled medications and recommended a recheck in five days if the prednisone did not help. (*Id.*).

At an appointment on May 30, 2008, Bush complained of chronic lower back pain that started with his work injury a year prior. (Tr. 303). Dr. Dyke noted that physical therapy had resulted in some success but that Bush was still complaining of pain and requesting Norco. (*Id.*). Bush also requested work restrictions exempting him from lifting barrels of beer weighing between 100 and 175 pounds each. (*Id.*). He further complained of one week of productive cough and head and nasal congestion. (*Id.*). He was diagnosed with chronic lower back pain and acute rhino-sinusitis, prescribed Norco, counseled on narcotic dependency and given unspecified work restrictions. (*Id.*). He was also referred to a Dr. Rahimi, a specialist in rehabilitative medicine. (*Id.*; 302).

At an appointment on July 19, 2008, Dr. Dyke noted that Dr. Rahimi contacted him about Bush's cardiac status, noting some indication of high blood pressure. (Tr. 291). Bush complained of reoccurring chest pain for a year that took his breath away, as well as cold sweats, apparently unrelated to his chest wall strain. (*Id.*). Dr. Dyke assessed him with high blood pressure without hypertension and atypical chest pains and advised on diet and exercise and weight management. (*Id.*). He also referred Bush to a cardiologist. (Tr. 290). The rest of the

notes from this appointment are illegible.  (*Id.*).  Chest x-rays taken that same day showed no acute cardiopulmonary findings.  (Tr. 288).  An echocardiogram conducted on July28, 2008, showed "normal left ventricular systolic function" and "age-related valvular changes without significant stenosis or regurgitation."  (Tr. 287).  An echo stress test conducted the same day showed no evidence of ischemia and a normal left ventricular systolic function.  (Tr. 284).

At a September 9, 2008 appointment, Dr. Dyke noted Bush's conditions as hypertension and high blood pressure along with chronic lower back pain, asthma and allergies.  (Tr. 281).  He noted that Bush was tolerating his blood pressure medications well with no chest pain, palpations or dizziness.  (*Id.*).  Dr. Dyke also noted that Bush wanted aqua therapy and that he would refer him back to Dr. Rahimi for that.  (*Id.*).  At an October 24, 2008 appointment, Bush was diagnosed with bronchitis and prescribed a Z-pak.  (Tr. 280).  At an appointment on December 4, 2008, Dr. Dyke's notes were almost identical to those of the previous appointment, with the addition of noting that Bush needed a letter to the friend of the court regarding his disability.  (Tr. 271).  A spirometry test conducted that same day revealed a mild restriction in his airway.  (Tr. 274).  At a January 12, 2009, appointment, Dr. Dyke noted filling out a form for Bush for disability and Medicaid.  (Tr. 269).  A February 12, 2009 letter from Dr. Dyke "To Whom it May Concern" noted that Bush had been diagnosed with hypertension, muscle spasm, asthma, irritable bowel syndrome, perennial allergic rhinitis, 7,8-Dihydrobiopterin synthetase deficiency, obesity, costochondritis, chronic pain syndrome, eczema and gastroesophageal reflux disease ("GERD").  (Tr. 443).  Dr. Dyke concluded that "[d]ue to the above diagnoses Mr. Bush has been unable to be gainfully employed which has led to Permanent Disability."  (*Id.*).

At an appointment on June 9, 2009, Bush reported shaking in his whole body upon awakening and episodes of stopping breathing while sleeping.  (Tr. 402-405).  Dr. Dyke assessed

9

fatigue and snoring and referred him for a sleep study.  (Tr. 405).  He also wanted to rule out

seizures and ordered a sleep-deprived EEG.  (*Id.*).[1]  At a July 7, 2009 appointment, Bush

reported chest pain that was mostly controlled but he indicated that exertion, such as mowing the

lawn, increased his pain.  (Tr. 398).  He also reported increased wheezing and whistling.  (*Id.*).

Upon examination, Bush was positive for a cough but there were no wheezes.  (Tr. 400-401).  He

was tender at mid-sternum.  (Tr. 401).  He was diagnosed with mostly stable chronic

costochondritis and acute exacerbation of asthma, but there were no changes in his treatment as a

result.  (*Id.*).  At a follow-up on July 31, 2009, Bush was seen for an evaluation of his obesity

and weight loss.  (Tr. 393).

In an undated letter, Dr. Dyke requested that Bush be able to use a cross-bow during

hunting season "[d]ue to his diagnosis of Chronic Low Back Pain, and Costochondritis."  (Tr.

417).  On September 17, 2009, a comprehensive urine drug screen conducted for Dr. Dyke

detected, among other things, methadone and cannabinoids.  (Tr. 418-421).  Bush's methadone

level was 2100 ng/mL and his cannabinoids concentration was 930 ng/mL.  (Tr. 420).  The

cutoff level for cannabinoids was 15 ng/mL.  (*Id.*).

iii.     Michigan Medical Physical Therapy

Bush underwent physical therapy for his chest wall strain from May 23, 2007 until June

21, 2007.  (Tr. 320).  Upon completion of the course of therapy, Bush denied neck or upper back

pain and reported a good home exercise program.  (*Id.*).  He reported that he would be returning

to work on June 25, 2007.  (*Id.*).  Upon examination, Bush's upper back and neck was

unremarkable to palpation, his range of motion full and without pain, and his strength was 4/5 in

---

[1] A sleep study and follow-up conducted on July 8, 2008, and August 18, 2008, revealed "no
major sleep pathologies to his sleep apnea and period leg movement disorder."  (Tr. 408-12).
Bush's awake/asleep EEG was normal.  (Tr. 432-36).

the scapular region and 5/5 in his upper extremities bilaterally.  (*Id.*).  He was deemed to have had an "excellent response" to physical therapy "with resolution of painful symptoms."  (*Id.*).  His therapy was discontinued due to "goal achievement."  (*Id.*).

iv.    Dr. Ramin Rahimi

Bush was initially evaluated by Dr. Ramin Rahimi, a specialist in rehabilitative medicine, on June 5, 2008.  (Tr. 295).  Bush reported that his back pain started with his work related injury in March 2007 and that physical therapy helped, but that his symptoms returned shortly after. (*Id.*).  He reported taking Norco 2-4 times a day.  (*Id.*).  He described his pain as a throbbing, aching sensation radiating from his right anterior chest wall to his mid-thoracic spine, and it rated 9/10 in intensity.  (*Id.*).  He also reported occasional parasthesia and numbness in his hands. (*Id.*).  He reported worsening symptoms when lifting over 40 pounds and improvement upon relaxation, lying down and physical therapy.  (*Id.*).  Upon examination, Dr. Rahimi noted somatic dysfunction of Bush's cervical, thoracic, lumbosacral and pelvic regions, and tender costochondral junction and right costal cartilages (ribs 2-6).  (Tr. 296).  He also noted, in a range of motion analysis, that Bush had limited cervical rotation in either direction and could bring his fingers to within six inches of the floor.  (*Id.*).  There was no instability in the joints and muscle strength was symmetrical.  (*Id.*).  He diagnosed Bush with chronic persistent costochondritis and ordered x-rays to rule out a bony abnormality.  (Tr. 297).  He also diagnosed the somatic dysfunction noted above, and prescribed a customized physical therapy plan and a back brace to be worn during the day.  (*Id.*).  Dr. Rahimi placed Bush on work restrictions of lifting no more than 25 pounds and no overhead lifting.  (*Id.*).  X-rays taken of Bush's sternum, thoracic spine and rib cage were all normal.  (Tr. 298-300).  Bush underwent physical therapy from June 17, 2008, through July 15, 2008, but reported no improvement overall, although his range of motion

increased.  (Tr. 366).  The physical therapist recommended continuing therapy for another month.  (*Id.*).

At a follow-up on July 17, 2008, Bush reported pain of 7/10 and heaviness along the left anterior chest wall to a greater extent than the right.  (Tr. 285).  He noted improvement with physical therapy with regard to his range of motion, but not with regard to his pain level.  (*Id.*).  He reported being off work because his employer did not accommodate his restrictions.  (*Id.*).  Dr. Rahimi diagnosed cervical myofascial pain dysfunctional syndrome and gave Bush a trigger point injection.  (Tr. 286).  He prescribed Lyrica and a Flector patch and advised Bush to cut down on his Norco intake.  (*Id.*).  Treatment notes from physical therapy revealed that upon completion of a second round of therapy, Bush reported his pain as 7-8/10, but that "maybe my muscles work better."  (Tr. 362).  It was recommended that he continue therapy for another month.  (*Id.*).  At a follow-up with Dr. Rahimi on August 25, 2008, Bush noted mid-thoracic pain of 8/10 and neck pain of 6/10.  (Tr. 343).  He had spasms and an increase of symptoms with physical therapy, especially with resistive exercises.  (*Id.*).  Dr. Rahimi assessed thoracolumbar myofascial pain dysfunctional syndrome, somatic dysfunction and cervicalgia with myofascial pain.  (Tr. 344).  Bush was responding to trigger point injections but found no relief with either the Flector patch or the Lyrica.  (*Id.*).  Dr. Rahimi refilled the Norco prescription, and recommended aqua therapy, noting that Bush "feels he has reached a plateau with land."  (*Id.*).  He recommended another injection in four weeks.  (*Id.*).  Notes from aqua therapy showed Bush reporting little improvement during the course of therapy.  (Tr. 359-61).

At a follow-up appointment on September 24, 2008, Bush noted pain intensity of 7/10.  (Tr. 341).  He had improved with osteopathic manipulative treatments, but plateaued with aqua therapy.  (*Id.*).  Dr. Rahimi's assessments were the same, but he recommended continuing with

Lyrica despite his earlier assessment, and also with the Flector patch stating "this does help him." (Tr. 342). He discontinued physical therapy and continued restricting Bush to lifting no more than 25 pounds. (*Id.*). At a follow-up on October 6, 2008, Bush reported a pain intensity of 6/10. (Tr. 339). Dr. Rahimi's assessments and recommendations did not change. (Tr. 340). At an appointment on October 28, 2008, Bush reported a pain intensity of 7/10. (Tr. 337). Dr. Rahimi increased his Lyrica dosage and continued his Flexor patch and work restrictions. (Tr. 338). At an appointment on November 26, 2008, Bush noted pain intensity of 6/10 and that Lyrica and Flector patches were helping. (Tr. 335). Dr. Rahimi continued his previous recommendations. (Tr. 336). At a follow-up on January 5, 2009, Bush continued to report pain intensity of 5-6/10. (Tr. 333). Dr. Rahimi affirmed his previous assessments and recommendations, including work restrictions. (Tr. 334).

At an appointment on February 5, 2009, Bush reported a pain intensity of 6/10 and a Tinel's test was positive at his bilateral wrists. (Tr. 331-32). Dr. Rahimi continued his medications, assessed hand parasthesia and numbness and ordered an EMG of the upper extremities. (Tr. 332). There are no EMG results in the record however.

v.      Dr. Vincent Dubravec

On January 22, 2007, Bush was treated by allergist Dr. Vincent Dubravec. (Tr. 261). Bush reported a history of allergy symptoms that were not being treated with medication until recently. (*Id.*). He was currently taking Nasacort and Loratidine. (*Id.*). He was diagnosed with asthma as a child, and had several emergency room visits a year for the condition but no hospitalizations. (*Id.*). He would receive prednisone bursts at his emergency room visits and these were generally his primary sources of medication. (*Id.*). He historically used an Albuterol inhaler frequently, up to four times a day and he noticed symptoms with exercising and eating,

13

which had increased in severity over the last two to three years. (*Id.*). He reported living about 50% of the time in a carpeted house with a smoker and a cat. (*Id.*). He also reported heartburn for which he took Tums and which he had not reported to his primary care physician. (*Id.*).

The results of a spirometry test showed a mild obstructive baseline with significant 16% improvement after an Albuterol nebulization treatment. (*Id.*). Dr. Dubravec diagnosed Bush with severe, persistent asthma, with smoke exposure and GERD playing a role, and allergic rhino-conjunctivitis. (*Id.*). He prescribed Advair twice a day, Flonase, and for Bush to continue samples of Singulair. (*Id.*). He also suggested trying Prilosec for GERD and adding Claratin for allergies as needed. (*Id.*). Dr. Dubravec stated he would reassess in two months. (*Id.*).

At a March 20, 2007 follow-up, Bush reported much improvement in his asthma since starting Advair and continuing Singulair along with the Prilosec. (Tr. 260). He denied any major asthma flares and only occasional nocturnal and exertional symptoms. (*Id.*). He had decreased his use of Albuterol to only several times weekly. (*Id.*). However, there had been no significant changes in his living environment and he still had smoke and cat exposure. (*Id.*). A spirometry test showed a borderline ratio much improved from initial baseline evaluation and even better than the post-bronchodilator spirometry at his initial evaluation. (*Id.*). Allergy skin testing revealed reactivity to numerous types of pollens, as well as molds and cat dander. (*Id.*). Intradermal testing revealed additional reactivity to dust mites and dogs. (*Id.*). Dr. Dubravec assessed Bush with moderate to severe asthma, much improved, and allergic rhino-conjunctivitis, improved with Flonase use. (*Id.*). He continued his medications, added Intal for use before visiting a house with a cat or smoke, and set a reassessment date for two months. (*Id.*).

At a follow-up on May 22, 2007, Bush reported compliance with his medications and stopping Singulair and Prilosec without any worsening symptoms. (Tr. 259). He reported

14

"breathing a lot better" and that he hadn't "been this clear in a long time." (*Id.*). He had decreased his Albuterol use to 2-3 times a week and reported no usual nocturnal or exertional symptoms. (*Id.*). His peak flows were stable and he had discussed immunotherapy with his primary care physician. (*Id.*). A spirometry test was within normal limits. (*Id.*). Dr. Dubravec diagnosed moderate to severe persistent asthma, well-controlled, and allergic rhino-conjunctivitis. (*Id.*). He recommended restarting GERD therapy and beginning allergen immunotherapy. (*Id.*). He also refilled Bush's prescriptions except for Singulair, and he added Fexofenadine for allergies. (*Id.*). Dr. Dubravec suggested reassessment in four months. (*Id.*).

Bush was seen again on September 18, 2007. (Tr. 258). He had initiated immunotherapy but was not yet at a maintenance dose. (*Id.*). He had continued his medications and noted stability with no major flare-ups and needing Albuterol only about once a week. (*Id.*). He also had no nocturnal or exertional symptoms and his GERD was well-controlled, as was his rhino-conjunctivitis. (*Id.*). He was being more physically active and watching his diet more, resulting in a decreased body weight. (*Id.*). A spirometry test revealed a borderline ratio, otherwise within normal limits. (*Id.*). Dr. Dubravec assessed well-controlled moderate to severe asthma, stable and controlled allergic rhino-conjunctivitis, and stable GERD. (*Id.*). He recommended that Bush try to decrease medications once he had built up to a maintenance dose in immunotherapy and that he return for reassessment in six months. (*Id.*).

At a July 1, 2008 follow-up with Dr. Dubravec, Bush reported that he had stopped immunotherapy for his allergies after building up about 75% to maintenance dose without any significant reactions. (Tr. 257). He wanted to restart immunotherapy at this point. (*Id.*). He reported taking Advair in the morning and about half the time in the evening, and that he had run out of Singulair, but that he noted improvement in his asthma symptoms when on Singulair.

(*Id.*).  He also reported having run out of Aciphex which he took for GERD.  (*Id.*).  He reported typically using Albuterol twice a week or less and that he had a nocturnal cough twice a week. (*Id.*).  He was not doing breathing exercises due to his chest wall strain.  (*Id.*).  He continued to use Flonase.  (*Id.*).  Bush could not say whether he had had up to three asthma flare-ups since his last appointment or whether he had been on any courses of prednisone.  (*Id.*).  Dr. Dubravec assessed him with moderate to severe, persistent asthma, allergic rhino-conjunctivitis and GERD. (*Id.*).  He recommended that Bush restart immunotherapy, consistently take his evening dose of Advair, take Flonase on a regular basis and hold off on continued use of Singulair until it was determined whether compliance with Advair would alleviate symptoms completely.  (*Id.*).  Dr. Dubravec continued to prescribe Fexofenadine for allergies and recommended that Bush follow up with his primary doctor regarding his GERD and he would reassess him in six months.  (*Id.*).

At a January 12, 2009 follow-up, Bush reported continuing his medications and building up his allergen immunotherapy "without any significant problems."  (Tr. 446).  He reported using Albuterol once or twice a week and having a nightly cough.  (*Id.*).  A spirometry test was normal, "with a borderline ratio."  (*Id.*).  Dr. Dubravec diagnosed "asthma, persistent, moderate to severe" but "overall stable," refilled Bush's prescriptions and recommended a recheck in six months.  (*Id.*).  At a follow-up on July 21, 2009, Dr. Dubravec noted that since Bush's last follow up on January 12, 2009, he had been building up allergen immunity, but stopped at the end of January due to "family problems."  (Tr. 422).  He noted generally well-controlled asthma, no nocturnal symptoms and using Albuterol about once a month.  (*Id.*).  The doctor renewed his prescriptions and recommended restarting immunotherapy treatments.  (*Id.*).  He suggested reassessment in six months.  (*Id.*).

vi.      Dr. Jeffrey Parker

On February 23, 2010, a Dr. Jeffrey Parker filled out a physician certification for Bush, to accompany his application for a Michigan medical marijuana card.  (Tr. 441).  He diagnosed Bush with severe and chronic pain, but provided no medical findings supporting his conclusion. (*Id.*).  Nor are there any treatment records of Dr. Parker in the record.

vii.      Physician Assistant Batz

A physician assistant ("PA") Batz, whose first name was not recorded, filled out a medical source statement for Bush on January 18, 2011.  (Tr. 449).  Batz concluded that Bush was capable of lifting 20 pounds occasionally and 10 pounds frequently, standing and/or walking six hours in an eight-hour day, sitting the same amount of time, and being unlimited in his ability to push and pull.  (*Id.*).  PA Batz indicated that he or she was "unable to assess [Bush's] extremity function comprehensively.  He's being referred to undergo functional assessment." (*Id.*).  PA Batz concluded that the limitations noted would disrupt a regular job schedule "40 hours or less" out of 160 hours a month.  (*Id.*).  There are no treatment notes in the file from PA Batz and no indication of upon what evidence he or she was basing the assessment.  (*Id.*).

b.      *Consultative and Non-Examining Sources*

A non-physician single decision maker for the State of Michigan completed a residual functional capacity assessment for Bush on May 5, 2009.  (Tr. 373-80).  She found him capable of lifting 20 pounds occasionally and 10 frequently, standing and/or walking about six hours in an eight-hour day and sitting for the same amount, and unlimited in his ability to push or pull. (Tr. 374).  She found no postural limitations except that he could only occasionally climb ladders, ropes and scaffolds.  (Tr. 375).  He was also to avoid concentrated exposure to vibrations, fumes and hazards.  (Tr. 377).

17

4.      *Vocational Expert's Testimony*

At the hearing, VE Richard Riedl first classified Bush's previous work.  (Tr. 38-42).  He classified Bush's job as a customer service representative as sedentary and skilled, up to medium as performed.  (Tr. 38).  He classified Bush's delivery jobs as medium and unskilled, but heavy as performed.  (Tr. 39).  Bush's job as a materials handler was classified as heavy and semi-skilled, and welding was classified as heavy and unskilled.  (*Id.*).  His merchandiser, equipment cleaner, and paint line hanger jobs were all medium, but heavy as performed.  (Tr. 39-42).

Next, the ALJ posed a number of hypothetical questions to the VE.  The first hypothetical involved a claimant of Bush's age, education, and vocational background who was:

> limited to doing light exertional work and that term is defined as lifting up to 20 pounds occasionally and 10 pounds frequently; standing and/or walking for about six hours out of an eight hour day; and sitting for six; and additionally the person may occasionally climb ladders, and scaffolds, and ropes; can frequently climb ramps and stairs; and frequently balance; could frequently stoop, kneel, crouch, and crawl; must avoid concentrated exposure to vibration, to fumes, odors, gas, poor ventilation, and to hazards such as unprotected heights and dangerous moving machinery…

(Tr. 63).  The ALJ then asked if such a person could perform any of Bush's prior work.  (*Id.*).  The VE testified that such a person could perform Bush's job as a customer service representative as it is described in the Dictionary of Occupational Titles ("DOT"), but not as actually performed by Bush, and that such a person could not perform any of Bush's other past work, which was all classified as at least medium in exertion.  (Tr. 63-64).  The ALJ then asked if there were other jobs such a claimant could perform.  (Tr. 64).  The VE testified that such a person could perform the jobs of packager (6,500 jobs in the Lower Peninsula of Michigan), cashier (30,000 jobs), or host or greeter (4,500 jobs).

The ALJ then asked the VE to imagine a person with a similar background, with all the same limitations, but was also limited to no lifting above the shoulder bilaterally.  (Tr. 65).  He

18

asked whether there would be any change in the VE's testimony about the ability of such an individual to perform Bush's past work.  (*Id.*).  The VE testified that there would be no change in his testimony.  (*Id.*).  The ALJ then asked whether there would be any change in the number of other jobs available to such an individual.  (*Id.*).  The VE testified that such a limitation would reduce the number of positions available as a packager from 6,500 to 3,500, and as a cashier from 30,000 to 20,000, but that the number of host/greeter jobs would remain the same.  (Tr. 65-66).

The ALJ then asked the VE to imagine a hypothetical claimant of Bush's background, who was limited to lifting 25 pounds with no lifting at or above shoulder height.  (Tr. 66).  He asked whether such a person could perform Bush's past work.  (*Id.*).  The VE testified that such a person could perform the job of customer service representative.  (*Id.*).  The ALJ then asked if there was other work such a person could perform.  (*Id.*).  The VE testified that the person could perform the medium exertion job of packager, with a reduction in number of jobs to 2,000 jobs, and the medium exertion job of production assembler, with a similar reduction to 5,000 jobs.  (Tr. 66-68).

### C.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that Bush could return to his past relevant work as a customer service representative and that, in the alternative, there existed a significant number of other occupations that he could still perform.  (Tr. 11-25).  At Step One the ALJ found that Bush had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 16).  At Step Two, he found that Bush had the following severe

20

impairments: "chronic pain of the chest wall (costochondritis) secondary to a lifting injury, asthma; gastroesophageal reflux disease; obesity [July 2009 height: 71 inches, weight 272 pounds]; and marijuana abuse." (*Id.*). At Step Three, the ALJ found that none of Bush's severe impairments, either alone or in combination, met or medically equaled a listed impairment. (Tr. 17). The ALJ then assessed Bush's RFC, finding him capable of performing "a modified range of medium work . . . Lifting and carrying are limited to a maximum of 25 pounds. Claimant is able to perform no over-shoulder lifting." (*Id.*). At Step Four, the ALJ found that Bush's RFC allowed him to still perform his past relevant work as a customer service representative. (Tr. 19). Although resolving the case at this step, the ALJ continued, in the alternative, to find that, based on Bush's age, education, vocational experience and RFC, coupled with VE testimony, he was capable of performing a significant number of other jobs available in the national economy. (Tr. 20). Therefore, Bush was not disabled. (*Id.*).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a

21

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

The arguments in Bush's brief are difficult to decipher.  His brief consists of one heading which identifies the issue in this matter as: "Whether the Commissioner erred as a matter of law by determining that Mr. Bush could return to his past relevant work as a customer service representative,"[2] followed by about two pages of analysis.  (Plf. Brf. at 6).  However, other than citing to the regulations for the proposition that the ALJ must make specific factual findings regarding how a claimant's past relevant work fits his current limitations, Bush goes no farther to expound on how the ALJ failed to perform that task in this case.  (*Id.*).  Bush does cite case law on the requirements for a proper hypothetical question to the VE, and mentions certain diagnoses of his treating physician that were not included in the ALJ's Step Two finding or hypothetical questions – his "chronic pain syndrome, muscle spasm [and] irritable bowel syndrome."  (*Id.* at 7).  Again, however, Bush makes no actual arguments as to the effects these diagnoses allegedly had on his capacity for work, let alone how the ALJ erred in not including these diagnoses in his findings or hypothetical questions to the VE.  (*Id.*).  Rather, Bush merely states that these "diagnoses' [sic] have severe symptoms that affects [sic] the claimant."  (*Id.*).

Bush also accuses the ALJ of inaccurately portraying their exchange during the hearing on the topic of the medical marijuana certificate.  (*Id.*).  Bush then makes a cursory argument that the ALJ's alleged misrepresentation about that exchange, coupled with his finding that Bush suffered from the severe impairment of marijuana abuse, was not supported by the record.  (Tr. 8).  However, he makes no argument as to the effect this alleged misstatement had on the ALJ's ultimate RFC assessment or how it would change the ultimate finding of "not disabled."  (*Id.*).

Bush's failure to make any developed arguments about any alleged errors in the ALJ's

---

[2] Bush does not appear to challenge the ALJ's finding that, as testified to by the VE, other jobs existed in the local and national economy that he could perform.  (Tr. 20, 66-68).

decision could permit this court to disregard his brief and simply look at the record to determine whether substantial evidence exists to support the ALJ's decision. *Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) ("A court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (internal citations omitted). Nevertheless, for the sake of completeness, the court will address Bush's under-developed arguments.

### 1.   Inclusion of Marijuana Abuse in Severe Impairments

Bush argues that the ALJ erred in finding he was an abuser of marijuana. The ALJ gave a few reasons for including "marijuana abuse" in the list of Bush's severe impairments. First, the ALJ noted that Bush "resides quite a distance[3] from Dr. Parker's [the medical marijuana doctor] office…" (Tr. 17). Second, the ALJ noted that "absolutely no treatment or even an examination by Dr. Parker is found in the record." (*Id.*). Third, the ALJ wrote that Bush was "unable to answer the question at the hearing of what medical impairment he planned to treat with marijuana." (*Id.*). Finally, the ALJ noted that "[d]espite the state permit, possession and use of marijuana remains a violation of federal law. Marijuana abuse and dependence remains a recognized medical impairment and, for this reason, it is included in [Bush's] 'severe' impairments." (*Id.*).

The ALJ erred only as to the third point. Preliminarily, in a point missed by both sides, at

---

[3] Bush consistently listed his address as 1067 Sweet, NE, in Grand Rapids, Michigan (*e.g.*, Tr. 94, 130), and Dr. Parker's office is located at 29777 Telegraph Rd. in Southfield, Michigan (Tr. 441). The court may take judicial notice that the distance between those addresses is, according to Mapquest.com, approximately 140 miles. *Atkins v. Berghuis*, 2010 WL 2604667, at *4 fn. 4 (E.D. Mich. May 21, 2010).

least according to the transcript, it was Bush's counsel, not the ALJ, who asked Bush about his medical marijuana certificate.  (Tr. 52, 55).  Counsel's question was compound and choppy, but ultimately, he simply asked Bush: "what is this?"   (*Id.*).   Bush answered that "the medical marijuana doctor [] requested my files from Dr. Dyke and they went over it and they said I was approved, and they gave me that piece of paper."  (*Id.*).  While Bush's answer may have merited further follow-up, neither counsel nor the ALJ did so.  The ALJ erred in concluding that Bush failed to answer a question about "what medical impairment he planned to treat with marijuana" (Tr. 17) as Bush was not asked that particular question.  (*Id.*).

The ALJ's error, however, was harmless and does not require remand.  First, whereas Bush testified that he had not yet been granted a card (Tr. 55), the medical evidence of record showed that a September 2009 drug screen revealed a level of cannabinoids far above the cutoff threshold.  (Tr. 420).  Therefore, contrary to his arguments, there was evidence in the record that Bush had previously used marijuana illegally.  Second, the ALJ's points about Bush living a far distance from Dr. Parker, there being no treatment or examination records from Dr. Parker in Bush's file, and the illegality of marijuana use under federal law even in a state that has legalized its use, *Gonzales v. Raich*, 545 U.S. 1, 27 (2005); *U.S. v. Hicks*, 722 F.Supp.2d 829, 833 (E.D. Mich. 2010) ("It is indisputable that state medical-marijuana laws do not, and cannot, supercede [sic] federal laws that criminalize the possession of marijuana") (citing *Gonzales*, 545 U.S. at 29), all have merit and constitute good reasons for the ALJ's conclusion.  Finally, as noted above, Bush fails to make any argument as to how the inclusion of marijuana dependency in the list of severe impairments in any way impacted the ultimate decision of the ALJ.

    2.    *Incorporation of Dr. Dyke's Additional Diagnoses into the Hypotheticals*

Bush appears to argue that the ALJ erred in not including all of Dr. Dyke's diagnosed

25

conditions in his hypothetical questions to the VE.  Specifically, Bush argues that the ALJ failed to include the conditions of chronic pain syndrome, muscle spasm, and irritable bowel syndrome. (Plf. Brf. at 7).  Again, beyond stating that these conditions have severe symptoms that affect Bush (*id.*), he fails to expound further on exactly what effects these conditions have on his capacity for work, or how their inclusion would have impacted the ALJ's RFC assessment or the jobs the VE testified were available to Bush.

Furthermore, although Dr. Dyke certainly qualifies as a treating physician, and thus his opinions are generally entitled to deferential treatment, 20 C.F.R. § 416.927, there is no evidence in the record from Dr. Dyke or anyone else as to how these conditions impact Bush's ability to do the work identified by the ALJ.  In fact, the ALJ specifically noted: "The claimant's alleged chest wall pain is documented by the medical evidence of record; however, the record does not demonstrate that this impairment is work-preclusive in any way."  (Tr. 18).  The ALJ decision cites the fact that after his injury and immediately before his alleged onset date, Bush had "continue[d] working for the beer distributor…"  (*Id.*).  The record, *see supra* at 4, also showed that Bush lost his job with the beer distributor because he could not perform its physically demanding requirements, whereas the ALJ found that the "record does not convincingly show that [Bush] is unable to perform …less physically demanding jobs."  (Tr. 18).  This is consistent with Bush's work history report in which he indicated that he lost his then job because "there are no other positions available for me to perform [] that do not involve lifting and carrying," which suggests that had less physically-demanding work been available, Bush would have continued working.  (Tr. 197).

The letter Bush cites from Dr. Dyke is merely a list of diagnoses along with a conclusion that, as a result of these conditions Bush cannot be gainfully employed "which has lead [sic] to

Permanent Disability".  (Tr. 443).  However, "the mere diagnosis of an ailment, of course, says nothing about the severity of the condition." *Long v. Apfel*, 1 Fed. Appx. 326, 331-332 (6th Cir. 2001) (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) ("When doctors' reports contain no information regarding physical limitations or the intensity, frequency, and duration of pain this court has regularly found substantial evidence to support a finding of no severe impairment associated with a condition.").[4]  In addition, a conclusion that a claimant is or is not disabled is one reserved exclusively to the Commissioner.  *Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985) (explaining that whether a claimant is totally disabled is a question reserved for the Commissioner).  *See also*, 20 C.F. R. § 404.1527(e)(1), (e)(3).

Here, Dr. Dyke did no more than list Bush's diagnosed conditions and then conclude that, due to these conditions he could not be gainfully employed.  He did not articulate any evidence upon which his conclusion was based, nor did he attempt to give specific limitations that caused Bush to be unemployable.  Therefore, the ALJ did not err in not accepting all the conditions listed in Dr. Dyke's letter or in rejecting his wholly conclusory opinions.  (Tr. 19).  *See Cohen v. Sec'y of Health and Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (An ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").

### 3.    *Bush's Ability to Perform His Past Work*

Finally, the court addresses Bush's argument that the ALJ erred in finding that he could return to his past relevant work.  The regulations state that the claimant bears the burden of proof of disability at Steps One through Four of the five-step sequential analysis set forth in 20 C.F.R.

---

[4]  Accordingly, Dr. Dyke's opinions are not entitled to controlling weight.   20 C.F.R. § 416.927(c)(2) (controlling weight only given to treating physician opinion that "is well-supported by medically acceptable clinical and laboratory diagnostic techniques…").

§ 404.1520.   Other than the two perfunctory arguments addressed above, Bush does not articulate any other reason why the ALJ erred in concluding that he is capable of performing his past relevant work.   A review of the entire record by this court reveals that substantial evidence exists supporting the ALJ's decision.   The ALJ noted Bush's activities, including shopping and laundry, and the fact that, even after Dyke had diagnosed him with chronic low back pain and costochondritis, Bush applied for a crossbow permit so he could hunt with it.  (Tr. 18, 417).   The ALJ also noted that the only limitations imposed by any acceptable medical source[5] showed Bush capable of lifting up to 25 pounds with no overhead lifting.  (*See e.g.* Tr. 19, 297; 342).   These are exactly the limitations the ALJ imposed upon him in the RFC assessment, and the exact limitations the VE testified would enable Bush to return to his past relevant work as a customer service representative.  (Tr. 17; 66).   Accordingly, Bush's argument on this point fails.

## III.   CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Bush's Motion for Summary Judgment **[8]** be **DENIED**, the Commissioner's Motion **[11]** be **GRANTED** and this case be **AFFIRMED**.

Dated: January 25, 2013
Ann Arbor, Michigan

s/David R. Grand
DAVID R. GRAND
United States Magistrate Judge

---

[5] The single decision maker at the preliminary denial of benefits was not a medical source (Tr. 19, 380), and PA Batz, as a physician's assistant, is not an acceptable medical source according to the regulations.  (Tr. 19); *see* 20 CFR § 404.1513 (listing acceptable medical sources as (1) licensed physicians, (2) licensed osteopaths, (3) licensed or certified psychologists, (4) licensed optometrists and (5) qualified speech-language pathologists).   Regardless, the ALJ did in fact pose hypothetical questions to the VE that accounted for both the limitations recommended by the single decision maker and by PA Batz, and the VE continued to testify that these limitations did not prevent Bush from returning to his past relevant work.  (Tr. 63-65).

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on  January 25, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

29